WILLIAM P. CLARK, ADMINISTRATOR OF DAVID T. CLARK, DECEASED, PLAINTIFF-APPELLANT, v. PUBLIC SERVICE ELECTRIC COMPANY, DEFENDANT-RESPONDENT.

*Submitted March 23, 1914—Decided June 15, 1914.*

1. If a jury believes certain witnesses and thus necessarily disbelieves a certain other witness as to what occurred between them and him; and, if he were found to be in *error* in this respect, the jury would have a right to believe that he was in *error* in other respects; and, if *falsifying* in any respect, they would have a right to believe that he was *falsifying* in all other respects, applying the maxim *falsus in uno, falsus in omnibus*.

2. A witness is not entitled to credit whose testimony is inconsistent with the common principles by which the conduct of mankind is naturally governed. This has application to the testimony to which reference is above made; and it was for the jury to say whether the deceased would have been likely to act as the single witness said

he did, or whether he would have been likely to shrink from contact with a flashing wire upon the well known principle of self preservation, appropriately called the first law of nature.

3. A trial judge is only justified in directing a verdict upon a court question arising from the admitted or uncontroverted facts of a case; and conflicting testimony, and its weight, must always be submitted to the jury for their consideration and determination.

4. It seems that a verdict will not be directed where the only person who could have contradicted the witness is dead.

5. There was testimony tending to show that the wire in question was improperly strung, passing through a tree and touching the branches; that it had been insulated, and that the insulation was worn and broken from friction with the tree; that at the point where the wire was thus worn and bare, it broke on the night of the accident. The respondent denied these facts and introduced evidence to show that the wire was properly inspected and that it did not break in the tree top at the point claimed by the appellant's witnesses, but broke at an entirely different place, namely, at a corner pole some distance away. This raised a question of fact for the jury to decide.

6. The accident happened in the month of June when there was no ice or snow to weigh down the wire and help cause it to break. Its breaking, if due to the storm, could only have been occasioned by the velocity of the wind. The testimony showed that at the time of the accident the wind was blowing seventy miles per hour. Such storms, however, were shown not to be entirely infrequent, there being records in the preceding ten years of wind velocities of seventy-six, seventy-four, eighty, eighty-three, seventy-two, seventy-eight and ninety-six miles per hour, and that it would take a wind velocity of one hundred and thirty-five miles an hour to break the particular wire if it were in good condition. Therefore, it cannot be said as a matter of law, that the storm in question, happening when it did, was one of such severity and unlikelihood that it could not have been anticipated or guarded against.

7. Besides, there was a question as to whether or not negligence of the respondent in the maintenance of this wire (including inspection of insulation) did not, in combination with the storm cause the injury resulting in the death of the appellant's intestate. If the injury so resulted, it may be presumed that the damage was caused by a defective wire.

On appeal from the Supreme Court.

For the appellant, *Arthur T. Dear* and *Charles E. S. Simpson.*

For the respondent, *Edwards & Smith.*

The opinion of the court was delivered by

WALKER, CHANCELLOR. This case was tried before a jury in the Hudson circuit. It resulted in a direction of a verdict for the respondent, and appellant appeals from the judgment.

The gravamen of the complaint is that respondent maintained in Jersey City certain electric wires and that on June 10th, 1911, through its negligence, one of the wires carrying electric current fell, and that decedent came in contact therewith, receiving a shock from which his death resulted. Respondent answered denying all allegations of negligence on its part, and further alleging that the falling of the wire was caused by inevitable accident, to wit, a storm of great and extraordinary violence. Appellant replied and issue was joined.

On June 10th, 1911, appellant's intestate was found during a storm, lying dead on Clinton avenue near the southwest corner of Clinton avenue and Sackett street, Jersey City, with a broken electric light wire of respondent's on or near him and a burn on his left hand. The testimony of most importance, and which was given controlling effect on the question of decedent's negligence, was that of the witness, Michael Walsh, a letter carrier, who stated that on June 10th, 1911, about ten o'clock at night he was going to deliver a letter; that he was on a car when a storm of lightning, thunder, heavy rain and terrific wind started; that trees were blown down and the car was stopped in order to take trees off the track; that he got off at Monticello avenue and ran up Communipaw avenue to Sackett street, stopped a few minutes in a doorway and started to run again along Sackett street, crossed Clinton avenue and discovered a live wire there; that it was hanging from a pole in front of No. 103 Clinton avenue; that it broke from the pole on the southwest corner and was flashing; that he asked some women in No. 107 Clinton avenue if anyone had telephoned for the police, but doesn't remember what was said; that he waited and saw decedent. Witness was examined as follows:

"*Q*. As he came over to you did you say anything to him and if so what did you say and what did he say to you?

"*A.* I told him to look out; there was a live wire; so he says, 'That won't hurt; there is insulation on it.' I said, 'Don't touch it, it is dangerous;' and part of it was hanging from the fence on the sidewalk and he went over and pulled it, and as he pulled it, it threw him over on his back and killed him.

"*Q.* As soon as it threw him on his back what did you do?

"*A.* I asked the ladies in the house to come over to the window, and I said, 'Give me a chair or something so I can knock it out of his hand,' and so they handed me a chair and I tried to put it out of his hand, and could not, and I took a few pillows and tried to get it out of his hand, and could not. I was afraid I would get electrocuted myself.

"*Q.* Did you stay there?

"*A.* I stayed around for a few minutes there and the policeman came up.

"*Q.* Then what did you do?

"*A.* I went up the street and delivered a letter.

"*Q.* Now, when you said to Mr. Clark, 'Look out, it is a live wire,' you say he said to you, 'It won't hurt me, it is insulated.' At the time Mr. Clark came there and you stated to him it was a live wire, was there any indication there showing it was a live wire?

"*A.* Why, yes, there was a flashing all over—all over the point that was touching the ground.

"*Q.* As I understand you, when you came there you were there all alone at first?

"*A.* I was alone, yes.

"*Q.* Clark came along afterwards?

"*A.* Afterwards."

On cross-examination he testified that the flashing was at the end of the wire; that there was insulation on the rest; it was all black except where it was flashing; that when he came from Communipaw avenue to Clinton avenue he was running to escape the rain; that when he came there no one was about and he saw only the people in the house.

In the next place, Walsh says that he called the attention of two ladies in the corner house to the fact that the wires

were down and asked them to telephone, and that it was while he was talking to them that the deceased came up and took hold of the wire. The appellant thereupon produced the occupants of the corner house, Miss Grace C. Baldwin and Miss Frances Baldwin. They each testified that there had been two other ladies in the house with them, one their mother, who was then dead, and the other an aunt, who was then in Washington. The Misses Baldwin each testified that neither of them spoke to anyone through the window; that their mother was all of the time in the dining-room, and that the windows were in the parlor; that the door between the dining-room and the parlor was open; that their aunt was with them in the dining-room and that neither of them heard anyone at any time talking at the front window, nor was the front window open at any time, and they were in a position whereby they could see everything that was going on. Neither of them saw the letter carrier at all.

James H. Scarr, weather expert in charge of the local office of the United States weather bureau in New York City, was examined and stated that there was a rain and thunder storm from seven-fifteen to seven fifty-five P. M., later from nine fifty-five to eleven forty-five P. M.; heavy rain and high wind; wind at ten-nineteen P. M. was seventy miles per hour. This storm was unusually severe, the fall of rain very heavy and the wind very high, driving rain before it. On cross-examination he stated that there was wind velocity in April, 1911, of eighty-three miles per hour, and that there had been other winds higher than seventy miles per hour.

At the conclusion of the case a motion was made for the direction of a verdict for the respondent upon the ground that there had been no negligence shown upon its part; that the wire was blown down by an unusual and extraordinary storm, one not to be expected and guarded against by the respondent; that decedent came to his death by the assumption of a risk, and was guilty of contributory negligence in picking up or touching a wire which he knew to be a live one, having been warned of its dangerous character.

After argument on the motion the court directed a verdict for the respondent, making the following observations:

"Under the decisions of our highest courts the verdict of a jury cannot stand unless there is some evidence to support it and it is the duty of the court, unless there is some evidence which would support a verdict, to direct the jury to bring in a verdict for the defendant. If the testimony of Walsh given in this case be true, the plaintiff has no case whatever. There is nothing that I can see that would justify you any way in discrediting Walsh's testimony. He was a government official; he was in the performance of his duty that night, and he says he warned this man who was killed not to touch that wire, and that after he received the warning he took hold of it —perhaps innocently, thinking he could do so in safety, but it turned out he was mistaken, and our courts have held if a man sees fit to take risks of that sort, why, he must take the risk and he cannot charge the effect of his own carelessness upon anybody else. Then, too, there is undisputed evidence that this was an unusual storm that night,· and the courts do not hold people responsible for the effect of storms unless they have good reason to anticipate them. You cannot anticipate unusual storms. It appears from the evidence that that was an unusual storm, not only in itself but in its effect, because it carried down a large number of trees and a large number of wires. Upon both grounds I have no hesitation in saying to you that if a verdict should pass in favor of the plaintiff it would not be sustained, and under the circumstances I am constrained under the law to say to you that your verdict must be for the defendant."

Appellant's counsel thereupon objected to the direction of a verdict for the respondent, and afterwards appealed to this court from the judgment entered upon the verdict of the jury rendered in conformity with the trial judge's instruction.

On behalf of appellant many grounds for reversal were assigned, which were argued under two points—*first,* that the learned trial court erred in directing a verdict for the respondent upon the ground that the deceased was guilty of

contributory negligence; and *second,* that respondent could be relieved from responsibility for the accident only upon proof that it was caused solely by an act of God, and that, as respondent's negligence contributed to the accident, the trial court erred in directing a verdict. Respondent's counsel argued only the first point raised by the appellant, asserting that no matter what caused the fall of the wire that fact was not of importance in the case, because the undisputed evidence demonstrated that decedent's death was caused by his deliberate and intentional act.

Now, if the witnesses, the Misses Baldwin, are to be believed—and the jury would have a right to believe them—the letter carrier was either in error or was falsifying, as to what occurred between him and them, and if he was in error in this respect the jury would have a right to believe that he was in error in other respects; and, if falsifying in any respect, they would have a right to believe that he was falsifying in all other respects, applying the maxim *falsus in uno, falsus in omnibus. Addis* v. *Rushmore,* 74 *N. J. L.* 649.

It will be remembered that the letter carrier, Walsh, testified that he warned the deceased that the wire was a live one and admonished him not to touch it; that in the face of this warning and admonition the deceased deliberately took hold of it and was killed. Practically everybody understands the danger lurking in a live electric wire. It is to be presumed that everyone warned of the existence of such a wounding and death dealing instrumentality would recoil from it. This wire was flashing fire at the time according to Walsh's statement.

Vice Chancellor Van Fleet, in *Earl* v. *Norfolk and New Brunswick Hosiery Co.,* 36 *N. J. Eq.* 188, said (at *p.* 194) that a witness is not entitled to credit whose testimony is inconsistent with the common principles by which the conduct of mankind is naturally governed. This judicial observation has pointed application to the testimony to which reference has just been made. Surely it was for the jury to say, in respect to the situation just adverted to, whether the deceased would have been likely to act as Walsh said he did, or whether

he would have been likely to shrink from contact with the flashing wire upon the well known principle of self preservation, quite appropriately called the first law of nature.

In the recent case of *Dickinson* v. *Erie R. R. Co.,* 85 *N. J. L.* 586, this court held that a trial judge was only justified in directing a verdict upon a court question arising from the admitted or uncontroverted facts of a case, and that conflicting testimony, and its weight, must always be submitted to the jury for their consideration and determination. See, also, *Fulton* v. *Grieb Rubber Co.,* 72 *N. J. L.* 35.

The rule seems to be, as stated in 38 *Cyc.* 1570, namely, that a verdict will not be directed where the only person who could have contradicted the witness is dead.

The respondent relies upon *Anderson* v. *Jersey City Elec. Light Co.,* 64 *N. J. L.* 664, and *Brooks* v. *Consolidated Gas Co.,* 70 *N. J. L.* 211, as justifying the trial judge in directing a verdict in its favor. In Anderson *v.* Jersey City Elec. Light Co. there was a nonsuit at the circuit and this court, in reviewing the judgment entered thereon, said (at *p.* 665) :

"We find nothing in the facts which would justify us in reversing the action of the trial court. Instead of receiving his injuries, as he alleges in his declaration, by unwittingly, and without any fault or lack of care on his part, coming in contact with this wire while engaged at his work (*Anderson* v. *Jersey City Electric Light Co.,* 63 *N. J. L.* 387), they are the result of his deliberately touching this wire, not in the performance of the work about which he was employed, but simply for the purpose of demonstrating the correctness of his judgment as to its harmlessness. He knew that the wire might be dangerous if the insulation was not perfect, and, having voluntarily assumed the risk of injury in order to vindicate the soundness of his judgment, he has no one but himself to blame for the consequence which followed."

There is no suggestion of conflicting evidence in this (Anderson) case as to what took place, nor concerning the plaintiff's negligence. Had there been, the case would have doubtless been submitted to the jury, and, if not, at least another question would have been involved on the hearing in

this court. The Anderson case, upon examination, will be found not to be an authority for respondent's contention.

The case at bar is more nearly like that of Brooks *v.* Consolidated Gas Co., in which this court held (at *p.* 215) :

"There was evidence from which the contributory negligence of deceased might perhaps be inferred, but none so conclusive as would justify an instruction for the defendant. It was shown that deceased had been warned by an employe of the defendant company of the danger of coming in contact with the wires. There was also evidence that a person warned deceased on the morning of his death, and upon learning that he was going to work on the balcony, that the wires were dangerous, and that deceased replied that he was not afraid of them. When first found, the left hand of deceased was firmly clasped upon the wire. If it may be inferred therefrom that deceased deliberately took hold of the wire, either to show that he was not afraid of it or for some other reason, his conduct was negligent, and if such was the only inference possible, a direction of a verdict would have been proper. *Anderson* v. *Jersey City Electric Light Co.,* 64 *N. J. L.* 664.

"But that inference was not a necessary one. Considering the warnings he had received, his declaration that he was not afraid of the wires may be intended to indicate that the work he was about to do would not put him in danger. And a reasonable inference from the circumstances may be drawn that when deceased leaned over the balustrade, engaged in painting the gutter, his left hand may have been placed upon the corner of the house, and by an unexpected slip have been caught in the loop of the wire. Whether, upon such an inference, he was guilty of negligence in thus placing his left hand, was a fair question for the jury."

Now on the other question, that of inevitable accident owing to the storm: There was testimony tending to show that the wire in question was improperly strung, passing through a tree and touching the branches; that it had been insulated, and that the insulation was worn and broken from friction with the tree; that at the point where the wire was thus worn and bare, it broke on the night of the accident.

True, the respondent denied these facts and introduced evidence to show that the wire was properly inspected and that it did not break in the tree top at the point claimed by the appellant's witnesses, but broke at an entirely different place, namely, at a corner pole some distance away. This raised a question of fact for the jury to decide.

The accident happened in the month of June when there was no ice or snow to weigh down the wire and help cause it to break. Its breaking, if due to the storm, could only have been occasioned by the velocity of the wind. The testimony showed that at about the time of the accident the wind was blowing seventy miles per hour. Such storms, however, were shown not to be entirely infrequent, there being records in the preceding ten years of wind velocities of seventy-six, seventy-four, eighty, eighty-three, seventy-two, seventy-eight and ninety-six miles an hour, and that it would take a wind velocity of one hundred and thirty-five miles an hour to break the particular wire if it were in good condition. It cannot, therefore, be said, as matter of law, that the storm in question, happening when it did, was one of such severity and unlikelihood that it could not have been anticipated or guarded against.

There was certainly a question as to whether or not negligence of the respondent in the maintenance of this wire (including inspection of insulation) did not, in combination with the storm, cause the injury resulting in the death of the appellant's intestate. If the injury so resulted it may be presumed that the damage was caused by a defective wire. *New Brunswick Steamboat Co.* v. *Tiers,* 24 *N. J. L.* 697.

True, that was a suit against a common carrier who is an insurer against loss of goods carried, and is not excused from liability when the loss is occasioned by an act of God, unless that act is the proximate cause of the injury; nor where the negligence of the carrier or any other person concurs with the act of God in producing the loss. In the case at bar the respondent, not being an insurer, would not be liable for damage occasioned exclusively by inevitable accident, but only from its own negligence.

The rule as to damages for injury resulting from negligence concurrent with inevitable accident is thus stated in 29 *Cyc.* 504:

"Nevertheless the rule imposing liability on defendant, although another efficient cause concurs with defendant's negligence, applies where an accident or act of God is the concurring cause. And the same is true where the primary cause was an accident for which defendant was not liable if the injury would not have resulted but for his negligence, or where by the exercise of ordinary care the result might have been essentially mitigated."

Upon this whole matter we are of opinion that the respondent's liability or non-liability for the accident resulting in the death of appellant's intestate was a question of fact which should have been submitted to the jury, and, therefore, the judgment should be reversed and a *venire de novo* awarded.

*For affirmance*—BERGEN, HEPPENHEIMER, JJ.   2.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, SWAYZE, TRENCHARD, MINTURN, KALISCH, BOGERT, VREDENBURGH, WHITE, JJ.   10.