**M. H. THOMAS & CO. v. HAWTHORNE et al. (No. 8701.)**

(Court of Civil Appeals of Texas. Dallas. Nov. 4, 1922. Rehearing Denied Dec. 16, 1922.)

1. **Estoppel** ⊂⊃75—Sales ⊂⊃234(7)—**Cotton owners not estopped to assert title to cotton intrusted to bailee.**

Where plaintiffs, farmers in the neighborhood of a village, intrusted their cotton to a merchant in the village, of long-standing integrity, on his representation that he would store it for them in his leased warehouse space in Dallas, and he shipped it to defendant, from whom he received advances on the cotton to within $10 a bale of its market value, and thereafter disappeared, *held* that the doctrine of caveat emptor applied, and that plaintiffs were not estopped to claim ownership of the cotton against defendant, having done nothing beyond the mere conferring of possession on him as their bailee, to mislead defendant, and not having been negligent in trusting their bailee's word or in failing to investigate his dealings, in view of his previous probity.

2. **Factors** ⊂⊃1—**Buyer of cotton from bailee could not escape liability to true owners as being a "factor."**

Where plaintiffs, farmers in the neighborhood of a village, intrusted their cotton to a merchant in the village, of long-standing integrity, on his representation that he would store it for them in his leased warehouse space in Dallas, and he shipped it to defendant, from whom he received advances on the cotton to within $10 a bale of its market value, and thereafter disappeared, *held*, that defendant, whose agreement with the bailee was not to sell on commission, but to allow the bailee to sell the cotton if kept properly margined, could not escape liability to plaintiffs as the true owners, on the ground defendant was a factor, a "factor" being an agent who pursues the business of selling for a commission goods or merchandise consigned or intrusted to his possession by the owner for the purpose of sale for the owner—a commission merchant.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Factor.]

**On Motion for Rehearing.**

3. **Trial** ⊂⊃140(2) — **Instructed verdict for plaintiff on uncontradicted testimony of interested parties held proper.**

It is proper for a trial court to instruct a verdict upon the uncontradicted testimony of interested parties when it is positive and unequivocal, and there is no circumstance disclosed tending to discredit or impeach such testimony.

4. **Trial** ⊂⊃140(2)—**That only person who could contradict testimony is dead is not ground for refusing to instruct verdict on such testimony, where free from suspicion.**

It is not the law that the court should refuse to instruct a verdict on uncontradicted testimony, free from flaw or suspicion, for the reason that the only person who could contradict such testimony is dead.

5. **Negligence** ⊂⊃136(26)—**Question of contributory negligence may be one of law.**

When the proof is such that no reasonable deduction can be derived from it except that it conclusively establishes an absence of negligence, the question of freedom from negligence is one of law, subject to the exclusive control of the court.

Appeal from District Court, Dallas County; W. F. Whitehurst, Judge.

Action by R. C. Hawthorne and others against M. H. Thomas & Co. From judgment for plaintiffs, defendant appeals. Affirmed.

Spence, Haven & Smithdeal, of Dallas, for appellant.

Robt. B. Allen, W. N. Coombes, and Cockrell, McBride & O'Donnell, all of Dallas, for appellees.

HAMILTON, J. Appellees and their assignors owned, severally, different individual lots of cotton in the fall of 1918. All of them (nine in number) were farmers who resided in the vicinity of Seagoville, a village in Dallas county, Tex. The aggregate number of bales of cotton owned by them was 169. The highest number of bales owned by any one of them was 68; the lowest number of bales in any of the lots was 6. This cotton was all lying in the cotton yard at Seagoville, except 11 bales at Forney and 16 bales at Kleburg. Forney and Kleburg are villages near Seagoville. All the cotton stored in the cotton yards was exposed to the weather and was deteriorating and being damaged, while the appellees, its several owners, held it for an advance in price.

W. O. Cardwell was engaged in the mercantile business and in the business of buying and selling cotton at Seagoville. Cardwell had lived in Seagoville many years and had been engaged in the same business there during a period of about 10 years prior to the happening of the event out of which this litigation arose. His father had been a business man in Seagoville many years before he himself had entered business. Apparently his conduct and dealings had always been characterized by honesty, integrity, and uprightness. Appellees themselves had transacted business with him, and he had the confidence of them all. Upon his career he had been adjudged by them to be an honest man, and, so

far as this record discloses, no circumstance had existed to impeach that judgment or render it equivocal. In his cotton transactions it seems that he bought various small lots of cotton from local owners and farmers and shipped it away in large volumes to cotton factors and dealers.

Some time prior to November 20, 1918, Cardwell, in what appeared to be a spirit of friendly concern and solicitation for the protection of appellees' cotton against deterioration in quality and value through exposure to inclement weather, began, and for some time persisted in, importuning them to deliver to him possession of their cotton in order that he might ship it to Dallas, there to be stored in a warehouse. He represented to them that he had under lease expansive floor space at the Shippers' Compress & Warehouse Company in Dallas. He stated, in substance, to each of them that his space at the warehouse was unoccupied, and that there would be no added cost to him to store their cotton there for them, and that if they would deliver possession of it to him for the purpose he would ship it to Dallas, store it in the warehouse and protect it while it remained there with blanket insurance which he already had. This representation as to insurance was made only to some of the owners. By this means, under the representations he made to them, they would be enabled to protect their cotton against injury from exposure while they awaited a better market upon which to sell. Finally each of them acceded to the suggestion and request thus made by him, and each of them delivered his cotton to Cardwell for shipment to Dallas.

Some of the owners themselves surrendered their yard tickets at the cotton yard and had delivery of the cotton made to the freight depot at Seagoville. Others delivered their tickets to Cardwell and he, by presenting them at the yard, there acquired possession of the cotton and had it delivered at the depot for shipment.

The cotton, possession of which was thus acquired by Cardwell from each of the owners, was shipped by Cardwell to M. H. Thomas & Co. at Dallas. The first lot of cotton thus acquired was shipped on October 17, 1918, and the other various lots so acquired by him he shipped on different dates thereafter, the last shipment being made about January 15, 1919. In the instance of each shipment a draft was drawn on M. H. Thomas & Co. and the bill of lading was attached to the draft. In the case of each shipment the cotton seems to have been consigned to "Shipper's order, notify M. H. Thomas & Co." Cardwell made the shipments pursuant to an understanding with M. H. Thomas & Co., by the terms of which Cardwell was to deliver to and M. H. Thomas & Co. was to accept from him 300 bales of cotton upon stipulated terms, and one of the provisions of the arrangement was that M. H. Thomas & Co. was to advance to Cardwell upon cotton actually shipped and delivered under the agreement money to within $10 per bale of its market value, Cardwell agreeing to protect M. H. Thomas & Co. with margins in case of market decline. As the drafts were drawn and presented they were promptly paid by appellant. In due course each of the shipments arrived in Dallas, was delivered, and passed under the dominion of appellant.

The following letter of confirmation to Cardwell from appellant reflects the agreement subsisting between these parties at the time the respective shipments were made, and under which the drafts with bills of lading attached were paid by appellant:

"Oct. 17, 1918.

"W. O. Cardwell, Seagoville, Texas.—Dear Sir: We confirm arrangement by which we accept from you 300 bales of cotton on the following terms: 100 bales 50 on December, New York. 200 bales 25 on December, New York, basis Middling nothing below Middling. We advance market value within $10 per bale, you to protect us with margins if the market declines. Price to be fixed at your call at any time before November 25th within market hours. It is understood between us that we have the privilege of selling this cotton immediately upon your failure to respond to our calls for margins. Please confirm this by return mail. [Signed] M. H. Thomas & Company, By ———."

Some time after the middle of January, 1919, the price of cotton having declined until the margins existing against it were insufficient, appellant, through its agents, attempted to communicate with Cardwell and obtain from him additional margin to protect the cotton against the declining prices. They were unable to effect communication with him and obtain funds from him for further margin. Whereupon, the margin being absorbed and Cardwell failing to respond to the calls for further margin, he was closed out by appellant.

About this time Cardwell's whereabouts became unknown and he could not be located. This circumstance having become known to appellees, they began to make investigation with reference to the cotton which had been shipped to Dallas by Cardwell under the agreement had with each of them, and they discovered then, for the first time, the true facts as to the shipments having been made in Cardwell's name, as to the drafts having been drawn by him and paid by appellant, and also the fact that all the identical bales of cotton delivered by Cardwell under the shipments made by him, except 7 bales, had been sold and exported by appellant. Cardwell at no time gave any of the appellees any information that the shipments were being made in the manner they were made, that he was shipping under bills of lading made to himself, or that he was consigning the cotton

"to shipper's order, notify M. H. Thomas & Čo."

The uncontradicted testimony of both of the appellees and their witnesses was to the effect that when the cotton was delivered to Cardwell for shipment it was to be stored in the warehouse of the Shippers' Compress & Warehouse Company, and in the names of the owners, and warehouse receipts issued in the names of such owners. In some instances representations were made by Cardwell to the owners of the cotton that he had blanket insurance which would protect it, as above stated. In other instances nothing was said between the owner and Cardwell at any time with reference to the matter of insurance. In each of the transactions the understanding with Cardwell was that when the owner decided to sell his cotton he himself was to make the sale; the only condition being that after obtaining the best offer he was to give Cardwell an opportunity to buy from him at the same price.

None of the owners ever obtained any receipt for the cotton after its shipment, and none of them made any inquiry with reference to it until after Cardwell had disappeared and the cotton, as above stated, had been sold by appellant and exported from Dallas. All of the owners, as we have already said, were farmers, and none of them had ever had any experience in shipping cotton or in warehousing cotton. They each believed that the cotton was stored in Dallas at the compress in their respective names, and none of them had any intimation of the arrangement between Cardwell and appellant or of any of the transactions had thereunder between Cardwell and appellant.

After the cotton was shipped, and during the period it was at the compress in Dallas, some of the owners received advancements of money from Cardwell without executing any note or giving him any evidence of indebtedness. These transactions were had under different circumstances. In some instances those to whom the money was advanced merely indicated to Cardwell that they needed money for a particular purpose, whereupon he suggested that he would supply it and immediately did so. In other instances where he made such advancements, the owners to whom they were made went to him and stated that, in view of the fact they needed money they were inclined to sell the cotton which was stored in Dallas and, in response, he insisted that the price would go higher, that they should not sell but should hold their cotton for the benefit of the advance in price and in the meantime he would supply them with the needed funds.

The farmers, being unable to obtain either the cotton or the value thereof after discovering Cardwell's default, entered into a transaction among themselves whereby seven of them assigned their respective claims and causes of action against Cardwell and all those claiming by or through him to the other two, R. C. Hawthorne and Luther Bowers, the appellees, and they brought this action against appellant for the value of the cotton received from Cardwell and sold by appellant, and also against appellant and the Shippers' Compress & Warehouse Company for recovery of the 7 bales of cotton still remaining in the warehouse of the Shippers' Compress & Warehouse Company in the city of Dallas.

The case was tried before the court and a jury, and, at the conclusion of the introduction of evidence, a peremptory instruction was given the jury to return a verdict in favor of the appellees for the value of the cotton received and disposed of by appellant, less the aggregate of the respective amounts borrowed by different ones of the farmers from Cardwell after shipment of the cotton, and also against appellant and the Shippers' Compress & Warehouse Company for the title to, and possession of, the 7 bales of cotton still remaining with the Shippers' Compress & Warehouse Company at the time of the trial, subject to accrued storage charges thereon. A verdict was rendered and judgment entered in conformity with this instruction, and from that judgment the appeal is prosecuted to this court.

The appeal is rested primarily upon two general propositions. The first proposition is that the case should be reversed and rendered for the following reasons, to wit: Appellant, being a bona fide purchaser for valuable consideration without either actual or constructive notice of any claim on the part of appellees, and it being the policy of the law to protect innocent purchasers for value and to suppress hidden titles by favoring those who deal openly with a party and in good faith, asserts it ought to prevail.

In this connection appellant asserts that appellees, by their own acts, clothed Cardwell with the indicia of ownership of their cotton, giving him possession of it and thus enabling him to impose upon appellant by inducing appellant to believe that he possessed authority to pledge the cotton to secure advancements or that he was the owner of it and endowed with all the authority of an owner to sell it.

Proceeding in the same connection, appellant asserts its dealings with Cardwell were in accordance with established customs of trade and that it relied upon the same evidence of ownership which all cotton merchants and cotton factors rely upon in purchasing cotton, and that, accordingly, not only was Cardwell invested with the indicia of ownership of the cotton, but that, in addition to this circumstance, Cardwell's apparent relation to the cotton with reference to ownership was all that was ever considered by the usages and customs of the cotton

trade in making such transactions, and that since appellees, through their own voluntary acts, gave Cardwell the evidences of his right to sell the cotton or obtain advances against it in accordance with the customs of trade and the common understanding of merchants in the cotton business, they cannot now be heard to dispute Cardwell's authority to pledge or sell the cotton so as to impose any legal liability upon appellant. And, upon the phase of the case embodied in this proposition, appellant advances the further contention that, when an owner of cotton in a cotton yard under the control of a public weigher surrenders the yard tickets covering it to a third party and negligently permits him to obtain the cotton through surrender of the tickets, ship it in his own name, taking bill of lading to his own order, and paying the freight charges, and permits him to ship it to a public warehouse where cotton is being assembled for the purpose of classification and grading prior to shipment to different world markets, the owner thereby proclaims such third party to be vested with both title and possession of the cotton.

The contention is made in this same connection that as between two innocent parties imposed upon through the fraud of a third person the loss should fall upon that one who by his own act created the circumstance which permitted the fraud to be perpetrated. Lastly, it is contended upon this point that appellant was a cotton factor in the transaction and, as such, took the cotton in good faith from Cardwell who had every indicia of ownership, sold it and accounted to Cardwell for the proceeds of the sale before any demand was made and that, therefore, being a cotton factor, it is not guilty of conversion since it had neither the cotton nor the proceeds of its sale at the time appellees' claim was made.

The sum total of all the propositions set forth in support of the theory that the judgment should be reversed and rendered, stated and summarized in general form, is that the acts and conduct of appellees and the other farmers whose cotton was shipped to Dallas by Cardwell under the circumstances above stated constituted estoppel, which was fully pleaded by appellant.

Under the alternative contention it is insisted that the trial court erred in giving a peremptory instruction to the jury, and that the case should be reversed and remanded.

Upon this feature of the appeal the following propositions are advanced: The trial court was not justified in instructing a verdict, because the proof was conflicting upon the material issues and was such that reasonable minds might reach different conclusions from the evidence even though there was no conflict in the testimony of the witnesses, an estoppel being pleaded and the issues being raised both in the pleadings and the evidence.

Additional reasons why the judgment should be reversed are embodied in complaints against leading questions propounded in depositions and also against the manner in which certain of the witnesses rendered their answers to the depositions, it being contended that the answers were not responsive and were expressions of mere opinions and conclusions, and also in their natures were argumentative.

The material facts are wholly undisputed. All the parties to the transactions with Cardwell seemed to be equally innocent, and his perfidy and deceit seem to have been practiced upon them all without discrimination. Appellant recognizes the general elementary rule that the owner of property cannot be deprived of it without his consent unless by operation of law, but insists that the facts of this case bring it within that class of cases which form an exception to this general rule, which is that if an owner by his own voluntary conduct and consent gives to another such evidence of the right to sell or otherwise dispose of his property, as, according to the customs of trade or universal understanding, usually accompany the authority to make sale or other disposition, then he who is intrusted with possession and with the indicia of ownership or with the authority to sell or make other disposition of the goods, in violation of his duty to the owner, sells them to an innocent purchaser, the rightful owner under such circumstances will be estopped from asserting his title against such purchaser, since it is proper that he, rather than the bona fide purchaser relying upon the evidence of ownership and authority in the person making the sale, should suffer the loss flowing from the owner's misplaced confidence. Numerous authorities are cited in support of this position, but we think the facts of this case are insufficient to sustain appellant's position under such authorities.

[1] The facts without any contradiction whatever seem to us completely to establish the conclusion that Cardwell's conduct in his dealing with and representations to appellees constituted, in effect, theft by fraud. Measured in terms of stealth, deception, and general turpitude, his acts and conduct place him virtually in the same attitude, so far as the farmers from whom he obtained the cotton are concerned, as his position would have been had he stolen it. There is nothing in the testimony to indicate that the farmers from whom he obtained the cotton clothed him with any indicia of ownership whatever beyond mere naked possession of the cotton. They gave him no other evidence of ownership in making delivery of the cotton to him or intrusting it to him for shipment, and they

made no character of representations to appellant nor did they withhold any knowledge from appellant which, under the circumstances, it was their duty to reveal to it. They were not informed and they were not required to expect that possession of the cotton would pass from Cardwell to appellant. There was no act either of commission or omission on the part of any of them which properly can be said to have been relied upon by appellant to believe that Cardwell owned the cotton when it paid his drafts, beyond the mere conferring of possession upon Cardwell by them. Whatever the evidence discloses that any of them did or neglected to do after the cotton was shipped to appellant, we think, is altogether unavailable to appellant as a defense against their claim. In the instance of each shipment, Cardwell's draft was paid by appellant before the cotton arrived and was delivered in Dallas. Accordingly, upon delivery of the cotton, appellant had already paid Cardwell for it. It is therefore perfectly plain that nothing any of the farmers did or failed to do in the interim which intervened between the respective shipments of cotton and the discovery of Cardwell's bad faith several weeks thereafter had any bearing upon the transactions between appellant and Cardwell, or tended to cause appellant to change its position in regard to the subject-matter of any of the transactions, or caused it to act in any manner different from the course it chose to pursue. Had the appellees and other farmers in the case of each shipment followed it up for the purpose of seeing that Cardwell performed his gratuitous undertaking in conformity with his pledge to them in each instance, the rights and relations of the parties would have been the same in the transactions as they now stand under the facts reflecting the owners' conduct subsequent to the shipments and payments of drafts.

The owners of the cotton were not under any duty to follow diligently the conduct and steps of Cardwell to see that he would perform and faithfully carry out the terms of the understanding had in every instance. They were justified in placing their trust in him to do what he had promised to do. His upright conduct and life of rectitude revealed before them and all men throughout the past justified this confidence. Therefore the owners, we think, did not act negligently and suffer the loss through their own negligence in resting their reliance upon Cardwell's word and failing to investigate at any time before the cotton was exported to see if he had kept it. They acted in this respect as ordinarily prudent men act in their relations with other men whose conduct through the years they know to have been consistently honest and true to the principles of fair dealing. It is the rare exception rather than the rule that such men ever cease to bear in mind that "a good name is rather to be chosen than great riches" and transform a life of rectitude into a cataclysm of knavery. And since, by the same test, they could not be expected to suspect that Cardwell would suddenly pervert his life to deceive or defraud appellant, it cannot be contended that they committed any negligence contributing to Cardwell's effecting his fraudulent purpose against appellant. They were therefore free from culpable negligence in failing to take steps to prevent a fraud upon appellant, as they were equally free from negligence in failing to safeguard themselves against it. To hold otherwise, in the light of the undisputed facts, it seems to us would be to discount esteem and confidence openly achieved through the practice of integrity, probity, and upright dealing, and to put approval upon suspicion and distrust in business relations, in the absence of conduct and circumstances to justify it.

And here we think it well to be reminded that the owners of the cotton were farmers whose business dealings in cotton never went beyond the confines of the simple transactions of making sales to local buyers. None of them had had any experience with or knowledge of the intricacies and burdens of commercial transactions which pertain only to the more expansive and complicated affairs of commerce among men. Not one of them had even dealt with a warehouse or compress. The record discloses without any contradiction all these facts and circumstances, and they have a potent bearing upon the right of estoppel in equity by reason of these farmers' acts and conduct toward Cardwell.

But, as the owners' confidence in Cardwell rested upon their knowledge of his apparently consistent honesty and good reputation, so, too, it may be contended that appellant trusted him with equal confidence resting upon the same foundation, since he was known to it and had had business relations with it during a period of five years and as completely had its confidence; and, as appellant, acting as a bona fide purchaser for value and without notice of any kind, paid Cardwell for the cotton, appellees rather than appellant should suffer the loss because they and the other owners, through their indulgent confidence, put Cardwell in a position to perpetrate the fraud.

However appealing this statement of appellant's position may be when presented abstractly, yet it is stripped of its force and rendered innocuous in the light of an examination of all the facts which reflect the conduct of the owners of the cotton. Those facts conclusively reveal that the owners did nothing more to confer upon Cardwell dominion over the cotton than to invest him with the mere possession of it. Since they had a right to trust Cardwell with such possession

under his agreement with them and, under all the circumstances and facts which imputed to him a reputation and character free from turpitude, and since the record fails to show that they, for any reason, owed appellant any duty to advise it of their ownership of the cotton, the mere delivery of it to Cardwell for the specific and express purpose of shipping it to Dallas for storage in their respective names precisely constituted the transaction a bailment and Cardwell a bailee. He violated the trust imposed upon him under the terms of the bailment which had been created solely through his fraud and deceit. Immediately upon acquiring possession of the property, he carried into execution his fraudulent and deceitful design, obtaining the fruits of it through payment of the drafts which he drew. Under the light of these facts we think his position toward the parties is in effect the same as it would have been had he stolen the cotton outright. Accordingly, the rule that the owner of personal property cannot be deprived of it without his consent applies, and the owners, having been guilty of no acts inducing the purchase beyond the mere act of delivery of possession to Cardwell, cannot be estopped in equity from asserting their title and ownership. The transactions between the owners and Cardwell constituting nothing less or more than a mere bailment, the act of the latter in breaching the trust in the mandatories conferred upon him in the various deliveries could not divest them of or impair their title. The doctrine of caveat emptor therefore rules this feature of the case and precludes appellant from asserting title because its vendor (Cardwell) had none. Stillman & Bros. v. Hurd, 10 Tex. 110; Case v. Jennings, 17 Tex. 662; Dodd & Co. v. Arnold, 28 Tex. 97; 3 R. C. L. 142; 5 Cyc. 188; Sandford v. Wilson, 2 Willson Civ. Cas. Ct. App. § 248; G. C. & S. F. Ry. Co. v. Taylor, 18 Tex. Civ. App. 571, 45 S. W. 749; Bullard v. Southwestern (Tex. Civ. App.) 172 S. W. 174.

Although the fact that appellant acted in the usual and customary way in dealing with Cardwell and parted with its money under such circumstances without any notice of his lack of ownership or authority to convey title may challenge as quite harsh a view contrary to its contention, it nevertheless remains that unimpaired title continued in the farmers. Appellant, having obtained the cotton as a result of Cardwell's violation of his bailments, cannot rely upon the maxim that he who trusts most must suffer most. 3 R. C. L. § 66.

[2] The force of the facts constituting the relation of bailee and bailor between Cardwell and the different owners of the various lots of cotton bought from him by appellant cannot be escaped upon the theory that appellant was a factor in the transaction and

that, since it was dealing only as a factor, it is not liable because, under the law applicable to a factor, demand must be made while the property or its proceeds are in its hands or notice of the true owner's title or the lack of title in the party who placed the property in its hands is brought home to it, thereby, and only thereby, fixing upon it a wrongful assertion of dominion over the true owner's property in contravention of his rights. Accepting this as a true statement of the law of liability as against a factor who derives possession of property from one who is not the true owner, still it can have no application here because the testimony does not support the conclusion that appellant was a factor in the transaction. A factor is an agent who pursues the business of selling for a commission goods or merchandise consigned or intrusted to his possession by the owner for the purpose of sale for the owner. 256 C. J. 340. He is nothing more nor less than a commission merchant. The facts do not even tend to show that the cotton sold by appellant was placed in its hands for the purpose of sale on commission for Cardwell. Under appellant's own testimony the cotton was margined with it by Cardwell under his agreement to keep it protected with further margins in event of market declines. The understanding was that the price was to be quoted as "fixed at Cardwell's call at any time before November 25th within market hours"; it being provided and agreed that appellant was to have the privilege of selling the cotton upon Cardwell's failure to respond to call for margins.

S. F. Cade, appellant's agent, testified as follows:

"Our contract with him was that he could bull that cotton on any market that he desired to sell it so long as the market was open. The market is open from 9 until 2; that is, he could sell it at any time on the market during market hours. In other words, if he would tell us any day at 9 o'clock in the morning 'to close me out' we would pay him for it on that day's market; that is, we would immediately wire to New York, and he would fix the New York market of that date. Then the advances if he had drawn any, would be deducted from what he received out of the cotton, and he would be paid the balance or credited with it. We handled that cotton in that way."

We find nothing in the evidence to indicate that appellant was handling the cotton on a commission basis.

We have carefully examined all of the assignments of error and propositions thereunder complaining of the admissibility of evidence. In our view, all the assignments of error pertaining to this feature of the procedure below are without merit and, as we do not think any useful purpose could be subserved by a discussion of them, we overrule them without further comment.

We think that the trial court did not err

in instructing a verdict for appellees, and accordingly the judgment is affirmed.

## On Motion for Rehearing.

The propositions and arguments contained in appellant's motion for a rehearing which were presented in the original brief do not suggest to us any reason for altering or further commenting upon the discussion of the case embodied in this court's original opinion. However, new arguments are brought forth in the motion for a rehearing based upon propositions which were not suggested in the motion for a new trial filed in the court below, nor in appellant's original brief in this court.

[3] In the motion for a rehearing, appellant for the first time squarely presents to the court two assigned reasons why the judgment of the trial court should be reversed and the cause remanded. The first of these propositions is that all the witnesses who testified below were interested adversely to appellant, and that therefore their credibility and the weight of their testimony was for the jury to pass upon, and that in these circumstances the court could not give a peremptory instruction based upon such testimony, although it was wholly uncontradicted.

There is no confusion or contradiction in the testimony of any of the witnesses. All their statements made by depositions propounded to them before the trial are free from equivocation and confusion, and are direct and positive. They were subpœnaed as witnesses by appellant and placed upon the stand by it in the trial of the case. There they each gave their testimony without material variation from the burden and effect of that contained in their respective depositions. No circumstance is indicated in the record or otherwise suggested to cast suspicion upon any of this testimony. On the contrary, while every witness who testified was an interested witness, yet we think the circumstance that each one of them testified to a state of facts concomitant with those testified to by all of the others in detailing the respective transactions with Cardwell may be said of itself to constitute an element of corroboration; and especially does this seem so to us, because there is no allegation or other suggestion of fraud or conspiracy among the various owners of the respective lots of cotton delivered to Cardwell. Each of these owners testified to an independent transaction with Cardwell wholly unrelated to each of the other transactions involved in the evidence contained in the record, and, in the absence of the idea of fraud and conspiracy among the witnesses, the conclusion is to us inevitable that the testimony of each tends to support and corroborate that of the others, notwithstanding that the element of interest runs throughout the

testimony. They were all engaged in an honorable pursuit, and nothing discreditable as to any of them is suggested.

Appellant cites numerous authorities from various jurisdictions holding that a jury may disregard the testimony of an interested witness, and that, in passing upon evidence given by a party to a suit or by a witness otherwise interested, the jury may altogether discredit it. We recognize the province of a jury to discard evidence given by an interested witness in a proper case, even though it may be altogether uncontradicted; but, where all the testimony in a case coming from numerous witnesses, as in this case, is unequivocal and without confusion, and no circumstance existing in connection with the adduction of the testimony to cast any cloud of doubtfulness upon it, then there is nothing to submit to the jury. A jury cannot arbitrarily discredit a witness and disregard his testimony in the absence of any equivocation, confusion, or aberration in it. It is not proper to submit uncontradicted testimony to a jury for the sole purpose of giving the jury an opportunity to nullify it by discrediting the witness, when nothing more than mere interest in the case exists upon which to discredit such witness. The testimony must inherently contain some element of confusion or contrariety, or must be attended by some circumstance which would render a total disregard of it by a jury reasonable rather than capricious, before a peremptory instruction upon the evidence can be said to constitute an invasion of the right of trial by jury. That it is proper for a trial court to instruct a verdict upon the uncontradicted testimony of interested parties, when it is positive and unequivocal and there is no circumstance disclosed tending to discredit or impeach such testimony, can be said to be a settled rule in Texas. This is the clear and positive effect of the decision in the cases of Joffre v. Mynatt, 206 S. W. 951, decided by this court, and Hill v. Staats, 187 S. W. 1039. This latter case was decided by the Fort Worth Court of Civil Appeals, Mr. Justice Buck rendering the opinion of the court. A writ of error was refused by the Supreme Court, no written opinion being delivered. However, an examination of the case renders it conclusive that the Supreme Court, in refusing the writ of error, placed approval upon the view of the Court of Civil Appeals that it is proper for a trial court to instruct a verdict upon the uncontradicted testimony of interested parties, their testimony being positive and unequivocal, and no circumstance being disclosed tending to discredit or impeach their testimony.

In that case appellant sought to recover damages for injuries inflicted through the negligence and recklessness of appellee's chauffeur in driving an automobile belonging to appellee. Appellant proved the injuries

and adduced evidence conclusively revealing that they were caused through the negligent and reckless operation of appellee's automobile by his chauffeur. This proof established a prima facie case against the appellee Staats. As a defense, appellee and his wife, both of whom were interested parties, testified to facts, which were uncontradicted, to the effect that, although the automobile belonged to appellee and was being driven by appellee's chauffeur at the time of the accident, yet it was not being operated within the scope of the chauffeur's duties but upon an errand outside of such duties and in express violation of instructions. The testimony of appellee and his wife being uncontradicted, and being positive and unequivocal, the trial court gave a peremptory instruction for appellee. The sole effect of the judgment of the Court of Civil Appeals, as well as that of the Supreme Court, in affirming the judgment of the trial court, was to establish the rule that in such circumstances it is proper to give a peremptory instruction. To the same effect is the decision of this court in the case of Dallas Hotel Co. v. Newberg, 246 S. W. 754, recently rendered by Justice Vaughan but not yet (officially) published. See, also, authorities cited in the case of Hill v. Staats, supra, and the following: T. & P. Ry. Co. v. Sherer (Tex. Civ. App.) dissenting opinion, 183 S. W. 409; Texas Life Ins. Co. v. Childress, 204 S. W. 1038; Grand Fraternity v. Melton, 102 Tex. 399, 117 S. W. 788; Felts v. Bell County (Tex. Civ. App.) 103 Tex. 616, 132 S. W. 123; Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059.

[4] As a second newly advanced ground for requesting this court to reverse and remand the cause, which was not in any way suggested in the motion for a new trial or in the assignments of error contained in appellant's brief, is the proposition that Cardwell was dead at the time of the trial and, for that reason, the credibility of the various interested witnesses for appellee should have been submitted to the jury because, as appellant contends, when testimony is given by a witness which could be contradicted only by a person who is dead, it is not proper to direct a verdict. Cardwell committed suicide about, or soon after, the time of the discovery of his perfidy. To support its position, appellant cites the following cases: Clark v. Public Service Elec. Co., 86 N. J. Law, 144, 91 Atl. 83; Bloomingdale v. So. Nat. Bank, 63 App. Div. 72, 71 N. Y. Supp. 306; Chicago Great Western Ry. Co. v. Price, 97 Fed. 423, 38 C. C. A. 239. No Texas case bearing on this specific question is cited, and our investigation has not disclosed that it has been passed upon by the courts of this state.

None of the cases cited by appellant, upon careful analysis, support the unqualified proposition that it is not proper to direct a verdict where the only person who could have contradicted an uncontradicted witness is dead. In the case of Clark v. Electric Co., supra, the witness whose testimony as to certain facts could be contradicted only by that of a dead person was in other respects directly contradicted by other witnesses in the case, and the ultimate conclusion in that case was that the judge was not justified in directing a verdict because there was an actual conflict in the testimony. The court said that a trial judge is justified in directing a verdict only upon a question arising from the admitted or uncontroverted facts in a case, and that conflicting testimony and its weight must always be submitted to a jury. The court did observe in that connection that the rule seemed to be as stated in 38 Cyc. p. 1570, that a verdict will not be directed where the only person who could have contradicted the witness is dead, but this statement, considered in the light of the actual situation in that case, does not warrant the conclusion that the court was laying down the proposition that in no event will a verdict be directed where the only person is dead who could have contradicted the uncontroverted testimony upon which a verdict is directed.

In the case of Bloomingdale v. Bank, supra, the facts, as stated by the Supreme Court of New York, were substantially as follows: The bank had discounted a note made by a distillery company, which seems to have been indorsed by another party and secured by purported certificates of the maker of the note that certain whisky had been deposited in its warehouses to be delivered to the holder of the certificates. Some time previous the makers were notified that the note, had to be paid at maturity and a Mr. Johnson, an officer of the maker, was introduced to plaintiff's manager by a person connected with one of the plaintiffs, who was an indorser of the note, and requested the plaintiff to take the note off the bank's hands, representing that there was a collateral note which attached 500 barrels of certain whisky. Plaintiff's manager stated he would investigate and subsequently instructed a clerk to go to the bank and see the president. This was a few days before the note matured. The clerk testified that he had a conversation with the president of the bank concerning the note, and that the president made certain representations. He also testified that he reported the conversation to plaintiff's manager, who stated that he thereafter called upon the president of the bank and had a certain conversation with him. The president of the bank showed the plaintiff certain certificates calling for 500 barrels of whisky. When the note came due, the plaintiff directed the clerk to go to the bank, take up the note, and bring back the certificates. This was done. The note was marked "paid." The certificates certified to the deposit of 500

barrels of certain whisky in a warehouse deliverable upon return of the indorsed certificates, and upon the payment of certain taxes and storage charges.

The plaintiffs, "before they sent to the defendant," had received a new note from the distillery indorsed by the original indorser. The note held by the bank was returned to the maker after being canceled. It subsequently appeared that the distillery had issued fraudulent certificates, and that the certificates, purporting to represent 500 barrels of whisky upon which Bloomingdale et al. made the loan complained of, in fact represented but 43 barrels. After obtaining information of the fraud committed by the plaintiffs in the case, they sent their clerk to Louisville to investigate the certificates. They employed lawyers there. Having definitely learned that the certificates represented but 43 barrels of whisky, plaintiffs surrendered the certificates for this whisky and subsequently sold it. There was no evidence that if the president of the bank made the representations testified to he did so fraudulently or with knowledge that they were false or to deceive anybody.

The suit was to rescind the transaction and to recover back the amount paid the bank for the note, although there was no allegation of recission. There was no allegation of tender of the note and certificates to the bank and the demand for the return of the money paid. The note which had become due and which was held by the defendant was stamped "paid" and, in that condition, it was received by the plaintiffs without objection and delivered to the maker.

On the question of tender as affecting the right to rescind upon the ground of misrepresentation, etc., appellant's clerk, employed by its manager, gave certain ineffectual testimony. He also testified that after he returned from Louisville, where he went to investigate and learned that the certificates were fraudulent he had a conversation with the president of the bank in which the latter made certain representations to him. Krause, appellant's manager, under whose direction the clerk worked, also testified to certain interviews with the president of the defendant bank.

Upon this testimony the appellants based their contention that the court should have directed a verdict in their favor for the reason that the jury was bound to believe the evidence, it being uncontradicted. The court in passing upon the evidence concluded that it showed no cause of action, but stated that, even if a cause of action were proved by it, a verdict should not have been directed. This was of the nature of dictum. The reason for the view so expressed, as stated by the court, was that Krause was the manager of the financial department of the plaintiffs' business and made the arrangements by which the new notes were discounted and the old note held by the defendant paid, and that, accordingly, he was interested in the transaction and, furthermore, that there was evidence making it doubtful whether he ever really went to the bank at all. Under such circumstances it was held that the court did not err in submitting the case to the jury, the president of the bank being dead and unable to contradict either of the witnesses, both of whom were interested as above stated, and the positions of both under the plaintiffs' employment being subject to termination at any moment, should they fail to give satisfactory testimony. The court expressly took notice of the fact that the assertion of Krause, who put the transaction through, assisted by Hamberger, the clerk, was to be doubted in the light of all evidence indicating that he never went to the bank at all and talked with its president who was dead at the time of the trial.

The case of Railway Co. v. Price, supra, is not authority for the contention that the sole fact of the only person who could contradict a witness being dead renders it necessary to submit a cause to a jury. In this case an interested witness testified to certain facts which it seems could not be positively contradicted by any person except a man who was dead at the time. One of the reasons given in that case why it was not proper to give an instructed verdict was that the testimony of this very witness was so contradictory and the motive for him to excuse his own delinquency by laying the fault of carelessness on one whose lips were closed in death so strong that his evidence could not be regarded as conclusive upon all reasonable minds as to certain conversations which took place between him and the dead man.

It thus appears that in this case, as well as in the case of Bloomingdale v. Bank, supra, the evidence of the witnesses which could be contradicted only by men who were dead was already clouded with suspicion and contradiction. The evidence of the witnesses in the case before us is not tainted with such conditions and circumstances. It is true that a phrase is found on page 1570, 38 Cyc., in the discussion of the general principle governing the direction of an instructed verdict to the effect that a verdict should not be directed upon the testimony of a witness who could have been contradicted only by a person who is dead. This phrase is appended to the end of a sentence enumerating cases in which it is improper to instruct a verdict. A reference to the footnote giving the authority for it reveals that it is based altogether upon the cases of Bloomingdale v. Bank & Ry. Co. v. Price, supra. That it is more expansive in its unqualified form than the holding of either of those cases becomes manifest upon reference to them. In its unqualified form

it is not a correct statement of the law determined by those cases, as it purports to be.

Our holding that the conduct of the owners of the cotton in reposing complete confidence in Cardwell did not constitute negligence is vehemently assailed, and, after an argument in which the facts are analyzed and considered, appellant's counsel propounds the more or less perfervid questions, "Who says they [the farmers] were free from negligence?" and, "Isn't negligence a question of fact?"

[5] The answer to the first of these questions is that the uncontradicted evidence compels the court to say, and inhibits the jury to gainsay, that they were free from negligence. The answer to the second question is that negligence is a question of fact only when the evidence presents an issue rendering possible more than one reasonable conclusion from the facts. When the proof is such, as in this case, that no reasonable deduction can be derived from it except that it conclusively establishes an absence of negligence, the question is one of law subject to the exclusive control of the court. Shawver v. Am. Ry. Ex. Co. (Tex. Civ. App.) 236 S. W. 802; Joske v. Irvine, supra.

The motion for a rehearing is overruled.