TEXAS LIFE INS. CO. v. CHILDRESS.
(No. 8830.)

(Court of Civil Appeals of Texas. Ft. Worth. April 6, 1918. Rehearing Denied May 11, 1918.)

1. INSURANCE ⊙⟶665(6)—LIFE POLICIES—DEFENSES—SUICIDE—EVIDENCE—WEIGHT AND SUFFICIENCY.

In an action on a life insurance policy stipulating against suicide, evidence *held* to show conclusively that the insured committed suicide intentionally by the use of carbolic acid.

2. INSURANCE ⊙⟶665(6) — LIFE POLICIES — SUICIDE.

Evidence that insured had at other times given directions as to the collection of his life insurance policies, in case of death, similar to those given just previous to his death in the

absence of proof of disease likely to produce sudden death, *held* not to disprove suicide, nor weaken the conclusiveness of evidence thereof.

3. INSURANCE ☞668(12)—LIFE POLICIES—ACTIONS—SUICIDE—DIRECTED VERDICT.

In an action on a life insurance policy stipulating against suicide, evidence of suicide *held* such that refusal to direct a verdict for defendant was error.

Appeal from District Court, Tarrant County; R. E. L. Ray, Judge.

Suit by Maggie Childress, as guardian of the estates of Rufie L. and Willie D. Turnipseed, minors, against the Texas Life Insurance Company. Judgment for plaintiff, and defendant appeals. Reversed and rendered.

Lee, Lomax & Smith, of Ft. Worth, for appellant. Ocie Speer and Marvin H. Brown, both of Ft. Worth, and Cal Estill, of Grapevine, for appellee.

DUNKLIN, J. Maggie Childress, as guardian of the estates of Rufie L. Turnipseed and Willie D. Turnipseed, minors, instituted this suit to collect two life insurance policies for the sum of $2,000 each, in favor of said minors issued to Wm. R. Turnipseed, father of said minors, by the Texas Life Insurance Company, and from a judgment in favor of the plaintiff for the full amounts named in the policies the insurance company has appealed.

The two policies were exact duplicates of each other, both dated September 25, 1914, and Wm. R. Turnipseed died during the night of May 21, 1915, less than one year after the date of their issuance. Each policy contained the following provision:

"In case of death by self-destruction, sane or insane, within one year from date of issue thereof, the amount payable shall be equal the total amount of premiums paid."

In its answer the defendant invoked that provision of the policy in connection with allegations that the death of Wm. R. Turnipseed, the insured, was caused by a dose of carbolic acid taken by him with suicidal intent; and defendant tendered in court for plaintiff's benefit the total amount of premiums paid by the insured for said policies, the amounts so paid being the premiums charged by the company for the first year.

The insured had been married twice. His first wife died about ten years prior to his death. About two years later he married his second wife, from whom he was divorced six years prior to his death. Miss Maggie Childress, sister of his first wife, had lived with the insured as a member of his family practically ever since the death of her said sister and had looked after his household affairs, taking the place of mother to his two minor daughters who were beneficiaries in the two policies in suit. At the time of his death insured was engaged in the business of buying cotton and writing life insurance. He was then living in Grapevine, and had been buying groceries for his family from Mr. Blevins, a merchant doing business in that town, and at the time of his death owed Blevins about $300 for groceries upon account extending over a period of practically one year. Insured also owed another merchant, Mr. Yates, doing business in Grapevine, a similar account for dry goods covering a period of about one year; also a debt to the Farmers' National Bank of Grapevine of about $250 and two accounts for merchandise purchased from merchants in Dallas extending over a period of about one year. By reason of financial straits insured had been unable to pay anything on any of those items of indebtedness for several months prior to his death, and three or four days prior to his death a suit had been filed against him on one of the debts he owed a merchant in Dallas, amounting to a sum in excess of $100. S. A. Wall, who also held a small account against him, had been pressing him for payment, and had been told by the deceased that he had lost money in cotton deals, and was unable to pay the account, but that he expected to pay all he owed and would do so. The total of his debts did not exceed $1,000. At the time of his death insured also had other insurance policies in other companies upon his life aggregating about $7,000, $5,000 of which was in the Federal Life Insurance Company, $1,000 of that amount being in favor of Miss Maggie Childress, and $4,000 in favor of his two daughters, and $2,000 in the Woodmen of the World, none of which policies it seems were subject to the defense of suicide urged in the present suit. Insured died on the night of May 21, 1915. On the morning of May 20th he left his home to go to Ft. Worth, and returned the following morning, having spent the night in Ft. Worth. For several days he had had some fever, and was under the treatment of his physician in Grapevine. After his return from Ft. Worth he spent the day at his home, and after the evening meal of that day he played a game of "42" with his family, and seemed in good spirits, and apparently in good health. He retired to his room about 10 o'clock, and the family knew nothing more of him until the following morning, when one of his daughters discovered his dead body lying across the bed in his room. A two-ounce bottle containing carbolic acid and so labeled was found upon a table in his room, also a glass containing some of the liquid in diluted form either upon a table near the bed or upon the foot railing of the bed. The body was still warm when it was discovered, the feet resting on the floor, and the bed showed no indication that it had been slept in during the night, or of any death struggle of the deceased in his last moments. On one side of his mouth there was a slight discoloration, such as might have been made by carbolic acid, and there was also found

---

in a book kept by the deceased four letters in his handwriting and signed by him. One of the letters was addressed to Miss Childress, and was dated either May 20, or 21, 1915, and on stationery of a Ft. Worth hotel. Another of the same date was addressed to his two daughters. Miss Childress testified that she destroyed those letters, but the contents of the one to her were proven by the testimony of those who read them. In the letter addressed to Miss Childress the deceased gave instructions for the payment of his debts out of his insurance policies. He also expressed the desire to 'have Miss Childress appointed guardian of his children, and that he wanted her to educate them and bring them up to be good girls and send them to Sunday school and church. Miss Childress testified concerning the letter addressed to the two girls as follows:

"He left a letter addressed to the girls. I saw that letter. I cannot recall the substance of the letter to the girls. I cannot recall a single sentence of that letter of the substance of it. I suppose I read it a number of times, but I don't remember just how many times. Yes, I probably read it more than once. It was destroyed at the same time with the letter that was addressed to me. I destroyed both letters. He didn't write a letter to each one of the girls, but wrote a letter to both of the girls. The letter to the girls bore the same date as the letter to me. * * * I don't remember whether it contained anything in the way of advice or counsel to the girls; it may have, but I don't remember the words. * * * The letter to the girls wasn't turned over to the girls first; it was turned over directly to me. It was in an envelope, but not sealed up. I didn't deliver the letter to the girls; I read it to them."

One of the letters was addressed to Mr. G. C. Blevins, his groceryman, who was also Counsel Commander of the Woodmen of the World. In that letter the writer stated that he desired Mr. Blevins to collect his account for groceries which the writer owed him out of the insurance policy held by the deceased in the Woodmen of the World. The writer also gave instructions how he wanted to be buried, and named the friends whom he desired to be his pallbearers. It also stated that he desired Walter McComb to drive the hearse. Another letter evidently written during the writer's trip to Ft. Worth immediately before his death as above noted was as follows:

"Metropolitan Hotel. Ft. Worth, Texas, 5—20—15. Farmers' National Bank, City—Gentlemen: My $5,000.00 life insurance in the Federal Life Insurance Company has been paid on three years' receipt in the policies and is absolutely good except premium note for $216.18 to be deducted from Miss Maggie Childress policy made payable to her. She will pay you what I owe. If you will let her have $100 until she can collect her money. Yours truly, W. R. Turnipseed."

A. W. McComb, a policeman in Ft. Worth, but who formerly lived in Grapevine, and who was acquainted with the deceased, testified that he had a conversation with the deceased about three days before his death. He further testified as follows:

"He talked to me some about his affairs. The first day, I recollect, he just spoke to me about the condition he was in; the way he put it to me was, we were talking about insurance, and he was after me to take out some more of him or to renew some that I had had, that is the way it came up. He spoke to me about taking out more on his life at that time—that is the way it came up, and he said that he was in pretty hard circumstances; he did not come out and tell me just how far, but he spoke of it, though, that he was in pretty hard shape, really, I think this is the same time, he told me several times that he would be better off, that is, he would just as soon be dead as living. He talked to me on more than one occasion along that line; he talked to me several times about it. I knew him pretty well; I was with him a good deal. How I happened to know him as intimately as I did, I worked for him a good deal around his place. The work I did for him was such work as hauling gravel and wood, and such things like that; I was doing that kind of work. He bought cotton, and I hauled some cotton for him."

None of the letters contained any direct statement of an intention on the part of the writer to commit suicide, and no witness testified that he ever heard him make any specific statement to that effect. Dr. Lipscomb, who was called in to examine the body soon after it was discovered in his room, testified that the slight discoloration on one side of the deceased's mouth was not such a burn as pure carbolic acid would make, but in his opinion was made by diluted carbolic acid. He further testified as follows:

"Carbolic acid when taken in large doses has a depressive effect—a shocking effect; it is an escharotic, and it produces a state of coma and unconsciousness, and affects the heart, too. It will paralyze the heart. From the examination I made of him and the physical surroundings in the room, while of course it is surmise because I never held an autopsy, and never made an exhaustive examination, but my conclusion at the time was that he died from carbolic acid poisoning; that was the conclusion I came to at the time. I still think his death was caused by carbolic acid poisoning. * * * No, I would not be willing to swear to this jury that carbolic acid killed him; I just arrived at that conclusion from appearances. It is my opinion, but I would not be willing to swear that carbolic acid killed him."

Miss Childress further testified that deceased while absent from home had written to her letters similar to the one found in his room at the time of his death, and that always in leaving home he would tell her things to do for the children in case anything should happen to him. She further testified that there was a medicine chest in deceased's room containing medicines, but there was no evidence that he was in the habit of keeping carbolic acid in that chest, or that he had ever taken it in any form for illness, or that he was suffering with any ailment which could be relieved by such a drug. Nor was there any evidence that he was in such a physical condition as might reasonably be expected to cause his sudden death. And all the witnesses, including the coroner who held an inquest over the body, by whom the facts tending to support the defense of suicide noted above were acquaintances residing in his

home town, and there is no suggestion in the record that they were in any degree unfriendly towards plaintiff or the minor children or biased in favor of appellant or interested in the suit.

John Estel, cashier of the Farmers' National Bank of Grapevine, to which insured was indebted at the time of his death, and to which the letter set out above was addressed, testified that the insured had written to him a similar letter prior to that one, containing instructions what to do in the event anything should happen to the writer. In that connection witness further testified that on a former occasion while insured was absent from home he wrote to the witness telling him that if anything should happen to him, or if he should die while he was absent from home he desired witness to wire for the policies which the writer said would be found in his suit case or in his pocket. Several witnesses testified that they did not notice the odor of carbolic acid in the room on the morning when the body of the deceased was found, while several other witnesses testified that they did discover such odor. Miss Childress further testified as follows:

"I didn't find a carbolic acid bottle in the room that morning. I don't know of my own knowledge that there was a bottle labeled carbolic acid found in the room that morning. I didn't see a carbolic acid bottle in that room or on the place that morning. I saw a glass sitting on the railing of the foot of the bed. I didn't see a small quantity of liquid in that glass. It is true I didn't make any special examination of the glass. It is true we were naturally very much excited when we found Mr. Turnipseed dead. I didn't notice any odor of carbolic acid when I went into the room. I didn't examine that glass to see what it contained. No, I don't know whether it contained carbolic acid or not."

[1] We are of the opinion that the evidence shows conclusively that the deceased committed suicide intentionally, and that the court erred in refusing appellant's request for an instructed verdict in its favor by reason of such proof. The testimony of some of the witnesses noted, to the effect that they did not detect the odor of carbolic acid in the room where the body of the deceased was found, and did not see acid in the glass, was strictly of a negative character, and at most amounted to no more than a mere scintilla of evidence to disprove the direct and positive testimony of a number of other disinterested witnesses that not only the odor of carbolic acid was detected by them, but also that there was a bottle containing such acid and some in diluted form in a glass sitting near the bed or on the foot railing of the bed. The letters left by the deceased written immediately before his death giving directions for the collection of his insurance, for the payment of the debts out of the proceeds, for the burial of his body, and the selection of his pallbearers, show conclusively an expectation on the part of the writer that he would soon die; and such proof taken in connection with his straitened financial condition, his statement to his friend McComb that he would just as soon be dead as living, the fact that the deadly poison was found in a glass so near his body, with no proof to show that the drug might probably have been purchased by him for any other purpose than to end his life, and the further fact that a trace of the acid was found on one side of his mouth, all lead inevitably to the conclusion that he took the poison with suicidal intent.

[2] The proof offered by appellee that on other occasions deceased had given similar directions with respect to the collection of his policies and the care of his children in the event anything should happen to him while absent from home, in the absence of proof of any physical infirmity or disease which might suddenly end his life, taken in connection with the other facts noted above, tended to some extent to show that deceased had contemplated suicide for some time prior to his death. At all events, we fail to perceive how such proof, under the circumstances related, tended to disprove suicide, or that it tended in any substantial degree to weaken the conclusiveness of the evidence offered by appellant to prove intentional suicide. Mutual Life Ins. Co. v. Tillman, 84 Tex. 31, 19 S. W. 294; Mutual Life Ins. Co. v. Hayward, 12 Tex. Civ. App. 392, 34 S. W. 801; Grand Fraternity v. Mattie K. Melton, 102 Tex. 399, 117 S. W. 788; Richey v. W. O. W., 163 Mo. App. 235, 146 S. W. 461, 465; Industrial Mutual Indemnity Co. v. Watt, 95 Ark. 456, 130 S. W. 532.

[3] In the case of Grand Fraternity v. Melton, supra, the defense urged to the suit upon the policy was that the insured committed suicide. The evidence to support the defense in that case, in our opinion, was no more conclusive than the evidence adduced upon the trial of the present suit to support the same defense. The plaintiff in that suit recovered a judgment which was affirmed by this court, but the judgment was reversed by our Supreme Court, who then rendered judgment in favor of the insurance company. After referring to the evidence the Supreme Court in that case used the following language:

"The jury were the judges of the weight of the evidence, but they could not lawfully deny proper weight to undisputed facts with no suspicion cast upon them. If the jury had the power to discredit any and every witness and to disregard any and all facts their verdicts could not be set aside by the judge nor reviewed by the appellate courts. Yet the law enjoins it upon the courts to set verdicts aside when contrary to the evidence or the law. The trial judge should not have submitted the case to the jury because the evidence did not raise an issue on the intention of Melton in shooting himself. By the evidence the Fraternity established to a moral certainty that Melton shot himself with intent to destroy his life, inflicting a wound from which he died. As a matter of law the defendant below was entitled to the verdict and the trial judge should have directed the jury to return a verdict for the defendant."

For the reasons indicated, the judgment of the trial court is reversed and judgment is here rendered in favor of the appellee for the sum of only $156.76, .the amount of premiums properly tendered to plaintiff in court by appellant, and also tendered to and refused by plaintiff before the institution of the suit. All costs of both courts must therefore be taxed against appellee.

Reversed and rendered.