GULF, C. & S. F. RY. CO. v. LEATHER-BURY. (No. 6698.)*

(Court of Civil Appeals of Texas. Austin. Dec. 30, 1923. Rehearing Denied Feb. 27, 1924.)

1. Trial ⬳139(1), 140(1)—Jury must pass upon credibility of witnesses and weight of testimony.

It is for the jury to pass upon the credibility of the witnesses and the weight to be given their testimony.

2. Master and servant ⬳281(9)—Finding act of employé was not in disobedience of orders held contrary to evidence.

A finding that deceased, a railroad civil engineer, who went out in a rowboat to inspect a railroad bridge, and was drowned, did not disobey the instructions of his superior officers to remain on shore, held not sustained.

---

⬳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction March 26, 1924.

**3. Master and servant ⬩243(1)—Intervening time between direction of master and act of employé in disobedience thereof held immaterial.**

Where decedent, a railroad civil engineer, lost his life while going out in a rowboat to inspect a portion of a bridge that had been washed away, that the instructions that he had received not to make the trip had been given some hours before was immaterial; the dangers at the time decedent made the trip being just as prevalent as when the instructions were given.

**4. Evidence ⬩590—Testimony of interested witness as to indisputable physical facts held not to be disregarded.**

In passing upon the credibility of a witness, the jury are entitled to consider the interest of the witness in the controversy, but cannot disregard his testimony as to undisputed physical facts and matters in which he is corroborated by other witnesses, some of whom are entirely disinterested.

**5. Evidence ⬩14—Dangers of stream at flood stage matter of common knowledge.**

It is a matter of common knowledge that certain streams in Texas at flood stage present a condition of danger apparent to any man of ordinary prudence to the lives of persons trying to cross them in a rowboat only 16 feet long and about 3 feet wide at its widest point.

**6. Master and servant ⬩217(1)—Risks assumed by servant.**

A servant assumes the risk of dangers of which he has actual knowledge, and of such hazards as he would have learned by the exercise of that ordinary circumspection which a prudent man would use in the particular employment.

**7. Trial ⬩139(1)—Court determines whether any evidence to go to jury.**

It is for the court to determine whether or not there is any evidence to go to the jury.

**8. Trial ⬩139(1)—Court should give peremptory instruction where there is "no evidence" to go to jury.**

Where the evidence is such that there is no room for ordinary minds to differ as to the conclusion to be drawn from it, there is "no evidence" to go to the jury, and the court should give peremptory instructions.

**9. Master and servant ⬩217(13)—Civil engineer drowned while going out in rowboat held to have assumed risk.**

Where decedent, a railroad civil engineer, lost his life while going out in a rowboat to inspect a bridge, part of which had been washed out, and knew, or should have known, the danger with which the trip was fraught, both from the physical facts and the warnings given him, *held*, that he assumed the risk of the undertaking.

Appeal from District Court, Bell County; Sam D. Snodgrass, Special Judge.

Action by Mrs. F. W. Leatherbury, community administrator, against the Gulf, Colorado & Santa Fé Railway Company. Judg-

ment for plaintiff, and defendant appeals. Reversed and rendered.

W. W. Hair, of Temple, Terry, Cavin & Mills, of Galveston, and Lee, Lomax & Wren, of Fort Worth, for appellant.

Winbourn Pearce and A. L. Curtis, both of Temple, for appellee.

BAUGH, J. On September 10 and 11, 1921, there was an unprecedented overflow on Little river, in Milam county, Tex., which covered about 4,800 feet of the track of the Gulf, Colorado, & Santa Fé Railway Company where same crossed it, washed most of it away, and washed out some 3,200 feet of the dump on which said track was laid. The water was so high on Saturday, September 10th, that nothing could be done toward repairing the dump and track. Early Sunday morning, the 11th, a work train with crew, equipment, etc., left Temple, Tex., to begin repairing the washout. On this train was placed at the instance of the foreman of the bridge and building department of the railway company, a boat. This boat belonged to the bridge and building department, and was built in 1913 for use in a similar overflow on this river at that time, but had been in the shops in Temple, out of water, since that time and was repaired for use the night before it was taken on this trip. Between 2:30 and 3 p. m. on Sunday, September 11th, while the river was still out of its banks and about a mile and a quarter wide at this point, F. W. Leatherbury, division civil engineer, and Maynard Robinson, master mechanic of defendant railway company at Temple, undertook to go in this boat out to what was known as the ballast deck bridge, then some 2,600 feet from the water's edge. In this undertaking both of them were drowned. This suit is by the widow of Leatherbury, as community administratrix, for herself and their child, for the death of the husband and father. She alleges that the boat furnished deceased was hurriedly constructed in an emergency, was not fit for use, that at this time the bow was warped and twisted, one side was split and leaky, and that the skag was off, rendering it impossible to steer it in swift water. She also alleged that it was the duty of the deceased, Leatherbury, as division engineer, to go out on these waters to the bridges of defendant, ascertain the damage, and make report thereof at once, so that material to repair the damage could be hauled there at once, and that the negligence of the defendant in furnishing him with a defective boat to perform his duties was the proximate cause of his death.

The defendant, in addition to a general denial, pleaded that Leatherbury had made the trip in disobedience of orders, instructions, and requests of his superior officers not to go; that such trip was not a part of his du-

---

⬩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

.ties; that there was no necessity for him to go at the time, and nothing to be gained therefrom; that the boat was not furnished him by the defendant, and that it owed him no duty with reference to it; that the defects in the boat, if any, were open, obvious, and patent to the deceased when he entered it; that he was expressly warned of the hazards and dangers of such trip; that he had had no experience in handling a boat on swollen streams or in swift water; that the dangers of such trip were fully known to him; and that by reason of these facts he assumed the risk of such trip for which the defendant was in no way liable. Both parties alleged that at the time of his death Leatherbury was engaged in interstate commerce.

Judge M. B. Blair, the regular judge at the time of the trial, was sick, and Hon. S. D. Snodgrass was elected special judge in his place. The case was tried before a jury, and on November 12, 1922, a judgment was rendered for plaintiff for $25,000, $15,000 apportioned to Mrs. Leatherbury and $10,000 to her minor daughter. From this judgment the railway company appeals.

The following detail facts appear to be undisputed:

That Leatherbury and Robinson started out in the boat on the upstream side of the railroad dump, rowed upstream in the eddying water some 2,000 feet, then turned toward the main current, which they reached at a point about 1,000 feet above what was commonly called the ballast deck bridge. This was in fact only a trestle from 20 to 25 feet high, with a ballast deck for a floor, distant some 1,600 feet from the main span of the bridge over Little river, and some 2,600 feet from the point where the boat started out, and was erected for the purpose of letting overflow waters through in case of floods. The current at this point at this time was swifter than at any other point in the stream. When Leatherbury and Robinson reached this current Leatherbury, who had been in the back seat of the boat, was seen to take his seat beside Robinson, each taking an oar. While thus engaged in trying to manage the boat in the current they were carried by the current out of sight of those on shore, behind a cluster of trees whose tops were above water. They were next seen just above the ballast deck bridge or trestle, in the current, both standing up in the boat, and going rapidly toward the underflow or suction created by the rush of the waters under the bridge, where they disappeared and were drowned. So far as the record shows, the boat was never found.' No one saw them drown, or knows just how they met their death. Further facts will be discussed in our opinion.

### Opinion.

This case is brought before us for review under 56 assignments of error; but we think those relating to the defense of assumed risk, and that the deceased undertook the trip in which he lost his life in disobedience of the orders and instructions of his superior officers, dispose of the case.

On question of disobedience of orders of his superior officers, the following testimony appears in the record:

Mr. W. M. Knowd testified:

"I am next in authority to Mr. Hull. At that time he was on sick leave in Virginia; I was his representative, and was acting superintendent of the Gulf, Colorado & Santa Fé Railway. I went to the Little river flood in 1921. Mr. Leatherbury, as division engineer, was under me, subject to my instructions; I was his superior officer. Mr. Robinson was under Mr. McQuillan, and everybody down there working for the Santa Fé was under me. I heard a discussion between Leatherbury and Robinson in the forenoon of Sunday with reference to an attempt to go out to the ballast deck bridge, the first bridge. I told Mr. Robinson that it was dangerous and unnecessary, and that I didn't want him to make the trip. Mr. Leatherbury showed considerable interest in being about this boat, and that led up to a conversation with him at this very time. There was positively no necessity for his going over there then, and I told him that I didn't want him to go. I had that discussion with Mr. Leatherbury in the morning about 10 or 11 o'clock somewhere.

"There was a discussion at the dinner table, and the discussion had reference to the height of the water, and that nobody must attempt to go in the boat. That conversation was started, as I remember, by Mr. McQuillan. Mr. McQuillan stated, it seemed to me with very great emphasis, that nobody must risk their life in attempting to make a trip in that boat on the river in the shape it was in. As I remember, I joined in with Mr. McQuillan, and told the men that those were my wishes, too. There was Mr. Robinson, Mr. McQuillan, Mr. Leatherbury, and myself sitting at the table. * * * At the dinner table there I repeated the instructions and orders that they were not to go. * * * They started out in the boat about 2:49 or 2:50 p. m., along about 3 o'clock. When they started out I was located approximately 400 feet north of their starting point up the track. I had no information or advice that they were going. Mr. Leatherbury had not left any transit with me, or nothing else. These men did tell me definitely—did promise me not to go. Mr. Robinson told me when I approached him, and said, 'You must not go,' he put his arm around my shoulder, and called me by my given name, and remarked, 'Don't you love me any more?' to which I replied, 'Yes; that is why I am talking to you.' Mr. Robinson then said, 'I am not going; are you satisfied?' and I said, 'Yes.' That is the conversation I had with Mr. Robinson about the matter. Mr. Leatherbury had previously promised me he would not go."

On this point J. E. McQuillan testified:

"I am ranking officer of the mechanical department of the Gulf, Colorado & Santa Fé. I was the direct superior of Mr. Robinson as division mechanic. I was the officer highest in

rank, but Mr. Knowd was in the transportation department, which department was concerned in getting these tracks ready for service again, and my department was down there to help. When this matter first came up, when there was some discussion between Mr. Robinson and Mr. Leatherbury and Mr. Clapp, they talked about the possibility of rowing a boat across Little river. As to where Mr. Leatherbury was, we were all right there in one party. He was like the balance of us; we all discussed it together. When this matter first came up I distinctly remember making the remark directly to Mr. Robinson, with the balance of us standing down there, that I didn't want any repetition of the Henry Martin case; that is, the case of Henry Martin, of the International & Great Northern, who was drowned in a similar manner near Valley Junction, on the International & Great Northern in 1913, in the Brazos river; he was general manager of the International & Great Northern Railroad. I think this conversation took place around the middle of the forenoon. In response to this Mr. Robinson laid his hand on my arm, and made this remark: 'Boss, you are not ·going to have a repetition of the Henry Martin case.' * * * At the dinner table that day the question came up again as to the possibility of getting across the river, and I stopped everybody right there at the table and called their attention, and told them I didn't want to hear any more talk from anybody about trying to cross the river. Mr. Robinson was there. From that time on until the men started out in the boat there was no more discussion of going across the river, that I recall. * * *

"My attention was first called to the fact that men were going to attempt to go out in that boat by Mr. Clapp speaking in an unusually loud tone of voice for the occasion and surroundings. Mr. Clapp is general foreman of the bridge and building department. I don't think I could recall his exact words, but when I turned and asked him what was the matter he says, 'I believe they are going to try to cross that river.' He referred to Mr. Robinson and Mr. Leatherbury. They were then in the boat, I suppose 20 or 30 feet from shore. I immediately went in that direction out toward the water, and commenced to beg them to come back. As near as I can remember, I called to them,. and made the remark, 'Maynard, I told you to stay out of that boat. Why don't you do it?' but they kept on going. There was no response. made any more than to look in my direction and smile, as though he thought I was unduly alarmed; sort of laughed at me. I kept on talking to them about coming back and keeping out of the boat. At the start I had no idea they really intended to cross, but they kept on going, and I told him that if they had in mind trying to cross that river for God sake to come back; they would never make it. I never got any response from them. I kept hollering, demanding, and begging them to come back. I don't remember whether I said to him as his superior officer to come back; the real truth is I was quite excited, and the further they went the more excited I became; but the mere fact of my commanding Mr. Robinson to come back should have been sufficient to have made him comply with my request. He was my subordinate and under my control. These two gentlemen certainly went out in that boat against my consent, and against my judgment as to its being a safe thing to do."

John Moore, bridge and building foreman for the Santa Fé for 15 years, testified as follows:

"I saw them when they started out. Mr. Clapp was remonstrating with them. Mr. McQuillan was especially emphatic about it. Mr. McQuillan was persuading them not to go before the boat was put in the water."

After they had started out in the boat he further testified that:

"Mr. McQuillan called out to them, 'Men, I command you to come back as your superior officer!' but they went on. He called any number of times in a loud tone; he spoke louder and louder, and hollered out to them very loud; kept getting louder and louder as they went out."

S. F. Clapp, general foreman of the bridge and building department, and who had ordered the boat taken down there, testified:

"Mr. McQuillan hollered to them to come back, maybe a dozen or more times, and so finally they got so far away he used his hands as a megaphone to make them hear. They were in hollering distance when he first commenced hollering."

James Strickland, a bridge foreman, and witness for plaintiff, testified:

"Mr. McQuillan was hollering at them about that time, and that attracted my attention. I heard Mr. McQuillan say, 'Mr. Robinson, I demand of you not to go!' Mr. Robinson at that time was about as far from him as from here to the wall [about 40 feet]. He said, 'I demand of you not to go!' As to what Leatherbury and Robinson did, they kept on going."

W. B. Love, an employé of the Santa Fé, who was at work there leveling the dump where the water had receded, testified:

"My attention was attracted by some men telling them to come back, saying, 'Come back; come back!' I think he said, 'I command you to come back!' I do not know the party who was calling; he must have been 50 or 75 feet from me. I heard later who he was. I understand that he was Mr. McQuillan. That is what first attracted my attention."

H. W. Carson, another employé, testified:

"He told them not to go; they couldn't make it over there; and he said, 'You will get drowned,' and to come back. He was standing back of them up on the bank when they started off. He was talking in a loud voice—very loud. He asked them not to go. He says, 'Boys, you can't make it;' says, 'You will be drowned.' He repeated it several times after they got further away and a little louder, calling them not to go. I didn't hear anybody else call to them. If anybody had stood there and hollered out across the water, 'I command you to come back!' I would have been pretty apt to have heard it. I didn't hear any one call that way."

Mr. R. L. Batte, Jr., a farmer, stock raiser, etc., who was born and reared near this river

in Milam county, and who was at the washout at the time, testified:

"Mr. Knowd and Mr. McQuillan were down there. I knew Mr. Knowd. I had not known Mr. McQuillan before that time. I heard them express themselves to these men as to their disapproval as to their going out into the stream. I couldn't repeat the exact words, but Mr. Knowd was very insistent, and Mr. McQuillan told them it was folly. Both of these gentlemen insisted there was no occasion for them going."

There were some differences amongst the numerous witnesses who testified as to whether the statements of McQuillan were commands, requests, or warnings. One or two witnesses who were there did not recall having heard McQuillan at all; but no one testified that he did not make his wishes known to Leatherbury and Robinson in one form or another in the morning, at noon, and again as they started out in the boat. Knowd's testimony as to his instructions and orders is not disputed except by that of Todd E. Shipp, who testified as follows:

"I live at Temple. Until recently I was working as foreman for the Gulf, Colorado & Santa Fé. I was discharged at 4 o'clock July 1st. I was not at Little river when these gentlemen were drowned. A few days after these gentlemen were drowned at Little river, some time after, a few days, I don't know what day it was, I was on a work train going to a wreck near Sallinas with Mr. Knowd. It was after night. The unfortunate death of these two parties at Little river a few days before was referred to in that conversation. Mr. Knowd stated to me in that conversation that he had told these men not to go on that trip, or that he forbade them to go, or in substance words to that effect.· After Mr. Knowd had stated this to me, I turned to him and said, 'What did you let them go for?' and he replied, 'Well, when I got to thinking about the importance of the work, and of the fact that Mr. Robinson was an expert boatman, I let him go.'"

On cross-examination, he testified further:

"I haven't talked to Mr. Pearce about this case. As to my talking to Mr. Curtis about this case, this is the first time I have seen Mr. Curtis since the accident occurred. I haven't talked to Mr. Wilkinson about the case, and haven't talked to either of the lawyers. As to whether I haven't had any recollection of saying it to anybody until I testified to it on the stand, I say I probably did; I ain't going to swear I didn't do it, but personally I have no recollection of ever having said it to a human soul since that time."

Mr. Knowd positively denied ever having had any such conversation with Shipp at any time. It is not disputed that Knowd was not present at the place and time Leatherbury and Robinson started out in the boat; nor is his testimony contradicted that he knew nothing about their going at the time, and that he was several hundred feet away when they started.

[1, 2] We have very serious doubts whether this testimony furnished sufficient evidence to go to the jury on the issue of disobedience of orders and instructions of his superior officers. The only testimony of probative value at all is that of the witness Shipp; and, while it is for the jury to pass upon the credibility of the witnesses and the weight to be given their testimony, we think the finding of the jury on this issue is contrary to such overwhelming preponderance of the evidence that we are unwilling to let it stand. Even, however, if there was sufficient evidence on this issue to go to the jury, we think the evidence on the issue of assumed risk is conclusive against the plaintiff. It is undisputed that Griffin, whom Leatherbury succeeded as division engineer, had made the trip in this same boat out to this bridge in 1913, and that Hopkins rowed the boat at the time, when the water was about as high as when they undertook this trip. It is also undisputed that Leatherbury's duty generally at the washout was to ascertain the character and extent of the damage done; to make an estimate of the material required to repair it, and to report same to the proper department. But the question in issue was whether or not his duties required him to risk his life in a small skiff on a swollen stream in this particular instance to get such information. It is true that Mr. Merritt, chief engineer of the Santa Fé, testified that Mr. Leatherbury was on the ground, knew the conditions, and would be supposed to use his discretion and judgment and act on it, but he also testified that, in this particular instance, when they did in fact undertake to go out to the bridge in the boat—

"The temporary replacements of tracks after washouts is not at all dependent upon the estimate made by the engineer. The first duty is to put the track down so that trains can be operated. In doing that work there is practically no wait upon the engineer. These estimates that the civil engineer makes and sends in are not for temporary repairing but for the rebuilding of the track on a permanent basis. It wasn't any part of the division engineer's duty, and particularly not Mr. Leatherbury's in 1921, when the water was at high flood, way up, a mile and a quarter wide at Little river bridge, to go out in a swift current to ballast deck bridge in the middle of the stream for any purpose. Nothing could be gained by it whatever. It was no part of his duty whatsoever. There was nothing to be accomplished by it that I can conceive of. So far as what was visible of the bridge, it could be seen from the bank, and as far as anything under the water, it could not be seen whether they were on the bridge or not, and any damage could not be determined until the water had subsided; nothing to be gained. He could have done nothing there that could have facilitated the laying of the temporary track."

On this point John Moore testified:

"The next morning the water had gone down to where we could walk over the bridge, about 7 o'clock. So the next morning Mr. Leatherbury could have walked over there. There was nobody waiting on Mr. Leatherbury to get any estimate of damage to repair that track at the time he went out, that I know of. As to whether it would have been hurried very much by getting the estimates that afternoon, it wouldn't have helped any. The water going down is what held us back."

Mr. Clapp testified:

"It was my function to make bill for bridges, or requisition for bridges, or to repair bridges. There was nothing to be gained by going over there at that time and risking your life out in the water. It would not have facilitated the work in particular; there was nothing that could be done over there. Even if you had found there was damage to the bridge, you couldn't have told the extent. You couldn't have made any bill from what you saw at all."

The water at this time was within four or five feet of the top of the trestle.

Mr. Knowd also testified as to his conversation with Leatherbury about 10 or 11 o'clock that morning:

"He said that the ballast deck trestle seemed to be O. K., and he remarked that he could make all the observations necessary through the transit instrument, and it wouldn't be necessary for him to go across to the ballast deck trestle; and I told him, 'Yes; undoubtedly he was there to co-operate with Mr. Clapp, the general foreman of bridges, and with Mr. Clapp the roadmaster in running elevations for them,' etc., stating to him further, and to which he agreed, that if the entire ballast deck trestle of 1,600 feet in length was washed away, that we could ship the material out to rebuild it from Arkansas City, and get it to the washout in plenty of time before we could bridge the 2,600-foot gap from the north shore line to the north end of the ballast deck bridge. * * * There was no purpose to be served in going out to the ballast deck bridge in the matter of the dispatch of business, for the reason that we had 2,600 feet of dump and bridging to put in on our side, the north side, which would require at the very best calculation three days' time. Further, there was no reason of their going there because 900 feet of very high dump was washed out from the south end of the ballast deck bridge that had to be replaced before we could get to the ballast deck bridge. As far as any estimate that Mr. Leatherbury was to make in the construction or reconstruction of that track, we were not waiting or depending on any statement Mr. Leatherbury was to make."

The entries made by Leatherbury on his note book at 9:30 that morning, introduced in evidence by plaintiff, show the following:

"Water falling 9 inches per hour; water has fallen 6 feet since 2:30 p. m. Saturday; 4,800 feet of track under water; 3,200 feet of dump washed out; 1,600 feet of track washed off of bridge; approximately 60,000 cubic yards embankment washed away; water 4 feet higher than 1913; both bridges apparently O. K."

Without setting out further testimony in detail, it shows that at the time the trip was undertaken the river was more than a mile wide; that the current at the ballast deck bridge was very swift; that the water on the up stream side of the dump was higher and swifter at the trestle than on the down stream side; that it was dangerous to undertake to cross it in any small boat; that Robinson and Leatherbury must have known of its dangerous character; that they had been repeatedly warned by those present of the risk of life involved in undertaking to cross it; that when they started out, in response to a call from witness Clark that he would likely have to swim, Leatherbury pulled off his boots; that Henry Martin, general manager of the International & Great Northern, had lost his life on a similar undertaking in a small boat in the Brazos river in 1913, in an overflow; that witness Batte had told them about his brother being drowned in this same river while undertaking to cross it as they were in a small boat; that Batte himself had been overturned in the same current in a similar boat; that their undertaking was taking their lives in their own hands; that Clapp had pleaded with them for several minutes as they got into the boat to go not to undertake it, because it was unnecessary and too dangerous. Strickland and Cervenka had gone out some 500 to 700 feet from shore only about 30 minutes before, but returned because of the swift current, and had told both Leatherbury and Robinson that it was too dangerous to undertake, and that they were afraid to go further because of the swift current; that they were warned of its dangers, and that they would risk their lives in an effort to reach the bridge, by the witnesses Moore, Knowd, McQuillan, Clapp, Strickland, and Batte. The witnesses Clark, Senn, Love, and Carson all testified that they heard such warnings given. On the question of such trip being dangerous, we find no controverting testimony of any consequence, unless it be that of Hopkins, who said that an expert oarsman could have crossed the river safely, but added on cross-examination:

"I don't believe anybody but an expert riverman who knew how to handle a boat in current and very strong currents had any business out on that water."

It is undisputed that Leatherbury had had no experience in rowing a boat. The testimony shows that Robinson's experience was confined to rowing a boat on a small, still water lake, about 300 yards square, near Temple; that he had had no experience in rowing a boat in a current or overflow; that he was physically strong, but that he

was an office man, and was not hardened to any prolonged or sustained physical effort.

It is in evidence that Hopkins and Griffin had crossed this stream under similar conditions in this boat in 1913. But the fact that they had done so safely did not reduce the admitted, proven, obvious, and apparent dangers of such an undertaking. A dangerous and imprudent undertaking that is successfully accomplished by one man does not make it prudent for another less experienced man to undertake a similar hazard. It was also in evidence that Henry Martin had been drowned in 1913, in just such undertaking; that Batte's brother had been drowned in this same current formerly in a similar undertaking, and that Batte,' himself, had come near·suffering a like fate by going out into this river in a small boat when it was overflowing its banks; and that all these facts were known to both Robinson and Leatherbury.

[3, 4] Appellee insists that the river was constantly falling during Sunday, and that by reason of that fact conditions were constantly changing; that, even if Knowd had ordered these men not to go out that morning, such orders or instructions did not apply at the time they did go because of the changed conditions. We think there is no merit in this. It is undisputed that when they did go the waters were more than a mile wide, still very high, the current still very swift, and dangers just as prevalent as during the morning and at noon.

[5] The credibility of the witness is for the jury, and in passing upon this they are entitled to take into consideration the interest of the witness in the matter in controversy; but certainly a jury cannot for this reason discard the testimony of witnesses as to undisputed physical facts and matters in which they are corroborated by numerous other ·witnesses, some of whom are entirely disinterested. The dangerous nature of the waters was undisputed even by appellee's own witnesses, and that ample warnings of their dangers were given the deceased is shown beyond dispute. It is a matter of common knowledge that such streams as this, in that section of Texas, at a flood stage which Little river was shown to have been at that time, present a condition dangerous to the lives of persons trying to cross them in a row boat only 16 feet long and about 3 feet wide at its widest point apparent to any man of ordinary prudence. Leatherbury was not sent out by any one in the employ of the appellant. It is not substantially controverted that it was not necessary for him to go out to this bridge that afternoon, and that the information he desired, obtained the next morning after the flood waters had subsided, would have served his purpose equally as well. There was no substantial dispute as to what his general duties were. But these duties did not require him to risk his life in their performance, even if it had been important for him to get the desired information as soon as possible. In the light of all these undisputed facts, we think the evidence was such that no reasonable minds could differ upon its conclusiveness that, if he did not go in open disobedience of the orders or instructions of his superior officers, no man in the exercise of ordinary care and prudence would have risked his life on such a trip when the dangers were obvious, and must necessarily have been known to both Leatherbury and Robinson. Clearly, we think, Leatherbury and Robinson assumed the risk of their daring, hazardous, and unwise undertaking, and the issue as to the alleged defects in the boat is not material.

[6] The rules as to assumption of risk by a servant are well settled in this state. In the case of Bonnet v. G., H. & S. A. Ry. Co., 89 Tex. 72, 33 S. W. 334, Judge Gaines, in an able opinion, laid down the following:

"If the master and servant stand upon an equal footing with respect to a knowledge of the danger, then, in case of an accident as a result of the danger, the master is exonerated. The servant owes no duty of inspection. He assumes the risks of a danger of which he has actual knowledge, and of such hazards as he would have learned by the exercise of that ordinary circumspection which a prudent man would use in the particular employment."

This rule has been followed in Ry. Co. v. Hynson, 101 Tex. 546, 109 S. W. 929. Patton v. Dallas Gas Co., 108 Tex. 327, 192 S. W. 1060, and in numerous decisions by courts of Civil Appeals. See, also, Clement v. G., C. & S. F. Ry. Co. (Tex. Com. App.) 236 S. W. 719; Gas Co. v. Patton, (Tex. Civ. App.) 147 S. W. 313. In the latter case, after quoting the rule, Rainey, Chief Justice of the Dallas Court of Civil Appeals, in referring to Patton, tersely says:

"If he was reckless and did not use his senses, he must takes the consequences."

[7-9] That it is the special province of the jury to pass upon the credibility of witnesses and the weight to be given their testimony is too well settled to· require ,discussion. However, it is for the court to determine whether or not there is any evidence to go to the jury. In passing upon whether or not there is "any evidence" to go to the jury, the Supreme Court of this state has interpreted this to mean that, where the evidence is such that there is no room for ordinary minds to differ as to the conclusion to be· drawn from it, there is "no evidence" to go to the jury, and the court should give peremptory instructions. Lee v. I. & G. N. Ry. Co., 89 Tex. 588, 36 S. W. 63; Joske v. Irvine, 91 Tex. 583, 44 S. W. 1059; Tex. Loan Agency v. Fleming, 92 Tex. 463, 49 S. W. 1039, 44 L. R. A. 279; Grand Fraternity

v. Melton, 102 Tex. 402, 117 S. W. 788; Bank of Amarillo v. Jones, 107 Tex. 631, 183 S. W. 874; Ins. Co. v. Childress (Tex. Civ. App.) 204 S. W. 1038; Hall v. Whipple (Tex. Civ. App.) 145 S. W. 310. Applying this rule to the instant case, we think that the uncontroverted evidence showed conclusively that Leatherbury and Robinson knew or should have known the dangers to their lives with which their trip to their death was actually fraught, both from the physical facts before them and from the warnings given them, and that their rash act in "taking their lives in their own hands," as one witness put it, was a risk assumed by them for which they cannot hold the railway company responsible in damages.

The conclusion we have reached makes it unnecessary for us to consider the numerous other assignments. We have set out at some length extracts from the testimony because we have concluded that the facts dispose of the case. We have not invaded the province of the jury, but we think that clearly, as a matter of law, in the light of the rules laid down by our Supreme Court, there was not sufficient evidence in this case to go to the jury, and that the trial court should have given peremptory instructions to find for the defendant. We think this should have been done on the undisputed facts in the case, and that nothing could be gained by remanding for another trial. The judgment of the trial court is therefore reversed, and judgment here rendered for the appellant.

#### On Motion for Rehearing.

In her motion for rehearing appellee complains, amongst other things, of some of the findings of fact made by this court. We have therefore re-examined the statement of facts, and are of the opinion that one of the findings complained of by appellee may be erroneous, and should be corrected. This finding in our former opinion was as follows:

"The testimony shows that Robinson's experience was confined to rowing a boat on a small, still water lake, about 300 yards square, near Temple; that he had had no experience in rowing a boat in a current or overflow."

John Moore seems to have been the only witness who testified as to Robinson's qualifications as a boatman, and his testimony on this point was as follows:

"Mr. Robinson claimed to know how to row a boat; claimed to be a skilled boatman. Leatherbury was advised of that fact—that Robinson was a skilled boatman."

And again the same witness testified:

"When he came around I said to him, 'Mr. Robinson, are you experienced in handling a boat?' and he said, 'I have handled them a right smart; I have handled them on Lake Polk;' that is a little lake just west of Temple; and I said, 'Well, there is a vast difference between Lake Polk and this current down here;' and he said he could handle it all right."

It is not controverted that Lake Polk is an artificial still water lake, about 300 yards square. It thus appears that our finding is perhaps too general, and might better have been stated that the only actual experience Robinson was shown to have had was in rowing a boat on Lake Polk, but that he claimed to have been a skilled boatman. We therefore make this correction of our former opinion.

To this extent appellee's motion is granted, and in all other respects it is overruled.

Motion overruled.